1
2 John W & Cynthia L Ferguson
3 202 White Bluff Dr
Guyton GA 31312

4 UNITED STATES DISTRICT COURT
5 SOUTHERN DISTRICT OF GEORGIA

**John W & Cynthia L Ferguson**

Plaintiff,

vs.

**Aurora Loan Services**

Defendant

**Federal National Mortgage Association**

Defendant

Case # **CV410-174**

AMENDED ORIGINAL PETITION

FILED
U.S. DISTRICT COURT
SAVANNAH DIV.
2010 SEP -3  AM 10:54
CLERK _____
SO. DIST. OF GA.

6

7 Date: _____

8 ** Notice: Amendment to this petition is an additional party, F.N.M.A. Please see addition of
9 lines 16-19**

10 Comes now  John W & Cynthia L Ferguson , hereinafter referred to as "Petitioner," and moves
11 the court for relief as herein requested:

12 **PARTIES**

13 Petitioner is   John W & Cynthia L Ferguson ,  202 White Bluff Dr   Guyton GA 31312.
14 Currently Known Defendant(s) are/is:  Aurora Loan Services , 2617 College Park Dr ,  NE
15 69361, by and through its attorney . Federal National Mortgage Association.

16 **STATEMENT OF CAUSE**

17 Defendant Federal National Mortgage Association, knowingly and maliciously perpetrated a
18 predicate act toward a carefully crafted connivance, in concert and collusion with the fraud of
19 other named Defendant(s), in furtherance of an ongoing criminal conspiracy to deprive Plaintiff
20 and others similarly situated, their homes.

21  Petitioner, entered into a consumer contract for the refinance of a primary residence located at

22  202 White Bluff Dr   Guyton GA 31312, hereinafter referred to as the "property."

23  Defendants, acting in concert and collusion with others, induced Petitioner to enter into a

24  predatory loan agreement with Defendant.

25  Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully

26  crafted scheme intended to defraud Petitioner.

27  Defendants failed to make proper notices to Petitioner that would have given Petitioner warning

28  of the types of tactics used by Defendants to defraud Petitioner.

29  Defendants charged false fees to Petitioner at settlement.

30  Defendants used the above referenced false fees to compensate agents of Petitioner in order to

31  induce said agents to breach their fiduciary duty to Petitioner.

32  Defendant's attorney caused to be initiated collection procedures, knowing said collection

33  procedures in the instant action were frivolous as lender is estopped from collection procedures,

34  under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for

35  the production of the original promissory note alleged to create a debt.

36  **IN BRIEF**

37  *(Non-factual Statement of Posture and Position)*

38  It is not the intent of Petitioner to indict the entire industry. It is just that Plaintiff will be

39  making a number of allegations that, outside the context of the current condition of the real

40  estate industry, may seem somewhat outrageous and counter-intuitive.

41  When Petitioner accuses ordinary individuals of acting in concert and collusion with an

42  ongoing criminal conspiracy, it tends to trigger an incredulous response as it is

43  unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary

44  people, just doing what they have been trained to do, are out to swindle the poor

45  unsuspecting borrower.

46  The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud

47  committed by people acting in concert and collusion, one with the other. Petitioner has no

48  reason to believe that the Agent, loan officer, appraiser, and others were consciously aware

49  that what they were doing was part of an ongoing criminal conspiracy, only that it was,

ORIGINAL PETITION                                                    2 of 24

and that, in the very least, have themselves negligently reimbursed of the nature they were perpetrating. Petitioner maintains the real culprit is the nature itself including the reason for failure to enforce the consumer protection laws.

## CAREFULLY CRAFTED CRIMINAL CONSPIRACY
### (Cultural State of the Real Estate Industry)

### THE BEST OF INTENTIONS

Prior to the 1980's and 1990's ample government protections were in place to protect consumers and the lending industry from precisely the disaster we now experience. During President Clinton's administration, under the guise of making housing available to the poor, primary protections were relaxed which had the effect of releasing the unscrupulous on the unwary.

Prior to deregulation in the 1990's, lenders created loans for which they held and assumed the risk. Consequently, Americans were engaged in safe and stable home mortgages. With the protections removed, the unscrupulous lenders swooped in and, instead of making loans available to the poor, used the opportunity to convince the unsophisticated American public to do something that had been traditionally taboo; home buyers were convinced to speculate with their homes, their most important investment.

Aurora Loan Services , Ameriquest, Countrywide, and many others swooped in and convinced Americans to sell their homes, get out of their safe mortgage agreements, and speculate with the equity they had gained by purchasing homes they could not afford. Lenders created loans intended to fail as, under the newly crafted system, the Lender profited more from a mortgage default than from a stable loan.

Companies cropped up who called themselves banks when, in fact, they were only either subsidiaries of banks, or unaffiliated companies that were operated for the purpose of creating and selling promissory notes. As will be demonstrated, these companies then profited from the failure of the underlying loans.

### HOW IT WORKS

Briefly, how it works is this, the Lender would secure a large loan from a large bank, convert that loan into 20 and 30 year mortgages and then sell the promise to pay to an investor.

80  People would set up mortgage companies buy securing a large loan from one of the major
81  banks, then convert that loan into 20 and 30 year mortgages.  In order to accomplish this
82  an Agent would contract with a seller to find a buyer, bring both seller and buyer to a
83  lender who would secure the title from the seller using the borrowed bank funds for that
84  purpose, and then trade the title to the buyer in exchange for a promissory note.

85  The lender then creates a 20 or 30 year mortgage with money the lender must repay within
86  6 months.  As soon as the closing is consummated, the promissory note is sold to an
87  investor pool.

88  Using the instant case as an example, a 147,150.00 note at 9.6510%%  interest over 30
89  years will produce $175,555.21     The lender can then offer to the investor the security
90  instrument (promissory note) at say 50% of it's future value.  The investor will, over the
91  life of the note, less approximately 3.00% servicing fees, realize $222,425.66 .  The lender
92  can then pay back the bank and retain a handsome profit in the amount of $89,033.94.  The
93  lender, however, is not done with the deal.

94  The lender signed over the promissory note to the investor at the time of the trade, but did
95  not sign over the lien document (mortgage or deed of trust).  The State of Kansas Supreme
96  Court addressed this issue and stated that such a transaction was certainly legal.  However,
97  it created a fatal flaw as the holder of the lien document, at time of sale of the security
98  instrument, received consideration in excess of the lien amount.  Since the lien holder
99  received consideration, he could not be harmed.     Therefore the lien became an
100 unenforceable document.

101 This begs the question: if keeping the lien would render it void, why would the lender not
102 simply transfer the lien with the promissory note?  The reason is because the lender will
103 hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full
104 amount of the lien as abandoned funds, and deduct the full amount from the lender's tax
105 liability.  The lender, by this maneuver, gets consideration a second time.  And still the
106 lender is not done profiting from the deal.

107 After sale of the promissory note, the lender remains as the servicer for the investor.  The
108 lender will receive 3% of each payment the lender collects and renders to the investor
109 pool.  However, if the payment is late, the lender is allowed to assess an extra 5% and keep
110 that amount.  Also, if the loan defaults, the lender stands to gain thousands for handling the
111 foreclosure.

112  The lender stands to profit more from a note that is overly expensive, than from a good
113  stable loan.   And where, you may ask, does all this profit come from?  It comes from the
114  equity the borrower had built up in the home.  And still the lender is not finished profiting
115  from the deal

116  Another nail was driven in the American financial coffin when on the last day Congress
117  was in session in 2000 when restrictions that had been in place since the economic
118  collapse of 1907 were removed.  Until 1907  investors were allowed to bet on stocks
119  without actually buying them.  This unbridled speculation led directly to an economic
120  collapse. As a result the legislature banned the practice, until the year 2000.  In 2000 the
121  unscrupulous lenders got their way on the last day of the congressional session.  Congress
122  removed the restriction banning derivatives and again allowed the practice, this time
123  taking only 8 years to crash the stock market.   This practice allowed the lender to profit
124  further from the loan by betting on the failure of the security instrument he had just sold to
125  the unwary investor, thus furthering the purpose of the lender to profit from both the
126  borrower (consumer) and the investor.

127  The failure of so many loans recently resulted in a seven hundred and fifty billion dollar
128  bailout at the expense of the taxpayer.   The unsuspecting consumer was lulled into
129  accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all
130  were acting under the guise of government regulation and, therefore, the borrower had
131  reason to expect good and fair dealings from all.  Unfortunately, the regulations in place to
132  protect the consumer from just this kind of abuse were simply being ignored.

133  The loan origination fee from the HUD1 settlement statement is the finder's fee paid for
134  the referral of the client to the lender by a person acting as an agent for the borrower.
135  Hereinafter, the person or entity who receives any portion of the yield spread premium, or
136  a commission of any kind consequent to securing the loan agreement through from the
137  borrower will be referred to as "Agent."  The fee, authorized by the consumer protection
138  law is restricted to 1% of the principal of the note.  It was intended that the Agent, when
139  seeking out a lender for the borrower, would seek the best deal for his client rather than
140  who would pay him the most.  That was the intent, but not the reality.  The reality is that
141  Agents never come away from the table with less than 2% or 3% of the principal.  This is
142  accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
143  fiduciary duty to the borrower and convince the borrower to accept a more expensive loan

144    product than the borrower qualifies for. This will generate more profits for the lender and,
145    consequently, for the Agent.

146    It is a common practice for lenders to coerce appraisers to give a higher appraisal than is
147    the fair market price. This allows the lender to increase the cost of the loan product and
148    give the impression that the borrower is justified in making the purchase.

149    The lender then charges the borrower an underwriting fee in order to convince the
150    borrower that someone with knowledge has gone over the conditions of the note and
151    certified that they meet all legal criteria. The trustee, at closing, participates actively in the
152    deception of the borrower by placing undue stress on the borrower to sign the large stack
153    of paperwork without reading it. The trustee is, after all, to be trusted and has been paid to
154    insure the transaction. This trust is systematically violated for the purpose of taking unfair
155    advantage of the borrower. The entire loan process is a carefully crafted contrive
156    connivance designed and intended to induce the unsophisticated borrower into accepting a
157    loan product that is beyond the borrowers means to repay. With all this, it should be a
158    surprise to no one that this country is having a real estate crisis.

159                            **PETITIONER WILL PROVE THE FOLLOWING:**

160    Petitioner is prepared to prove, by a preponderance of evidence that:

161    •   Lender has no legal standing to bring collection or foreclosure claims against the
162       property;

163    •   Lender is not a real party in interest in any contract which can claim a collateral
164       interest in the property;

165    •   even if Lender were to prove up a contract to which Lender had standing to enforce
166       against Petitioner, no valid lien exists which would give Lender a claim against the
167       property;

168    •   even if Lender were to prove up a contract to which Lender had standing to enforce
169       against Petitioner, said contract was fraudulent in its creation as endorsement was
170       secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in
171       the inducement, fraud in the execution, usury, and breaches of contractual and
172       fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage
173       Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of
174       Pooled Assets," "Trustee or officers of Structured Investment Vehicle,"

175           "Investment Banker." "Trustee of Special Purpose Vehicle/Issuer of Certificates of
176           'Asset-Backed Certificates.'" "Seller of 'Asset-Backed' Certificates (shares or
177           bonds)." "Special Servicer" and Trustee, respectively, of certain mortgage loans
178           pooled together in a trust fund:

179     •  Defendants have concocted a carefully crafted connivance wherein Lender
180       conspired with Agents, et al. to strip Petitioner of Petitioner's equity in the property
181       by inducing Plaintiff to enter into a predatory loan inflated loan product:

182     •  Lender received unjust enrichment in the amount of 5% of each payment made late
183       to Lender while Lender and Lender's assigns acted as servicer of the note:

184     •  Lender and Lender's assigns, who acted as servicer in place of Lender, profited by
185       handling the foreclosure process on a contract Lender designed to have a high
186       probability of default:

187     •  Lender intended to defraud Investor by converting the promissory note into a
188       security instrument and selling same to Investor:

189     •  Lender intended to defraud Investor and the taxpayers of the United States by
190       withholding the lien document from the sale of the promissory note in order that
191       Lender could then hold the lien for three years, then prepare and file Internal
192       Revenue Form 1099a and falsely claim the full lien amount as abandoned funds
193       and deduct same from Lender's income tax obligation:

194     •  Lender defrauded backers of derivatives by betting on the failure of the promissory
195       note the lender designed to default:

196     •  participant Defendants, et al. in the securitization scheme described herein have
197       devised business plans to reap millions of dollars in profits at the expense of
198       Petitioner and others similarly situated.

199                            **PETITIONER SEEKS REMEDY**

200   In addition to seeking compensatory, consequential and other damages, Petitioner seeks
201   declaratory relief as to what (if any) party, entity or individual or group thereof is the
202   owner of the promissory note executed at the time of the loan closing, and whether the
203   Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
204   Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
205   alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

## PETITIONER HAS BEEN HARMED

206

207    Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

208    Such harm and detriment includes economic and non-economic damages, and injuries to

209    Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

210    In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the

211    equitable relief requested herein is granted.

212    *STATEMENT OF CLAIM*

213    *DEFENDANTS LACK STANDING*

### No evidence of Contractual Obligation

214

215    Defendants claim a controversy based on a contractual violation by Petitioner but have failed to

216    produce said contract. Even if Defendants produced evidence of the existence of said contract in

217    the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence

218    that a contract actually existed at one point in time. A copy, considering the present state of

219    technology, could be easily altered. As Lender only created one original and that original was

220    left in the custody of Lender, it was imperative that Lender protect said instrument.

221    In as much as the Lender is required to present the original on demand of Petitioner, there can be

222    no presumption of regularity when the original is not so produced. In as much as Lender has

223    refused Petitioner's request of the chain of custody of the security instrument in question by

224    refusing to identify all current and past real parties in interest, there is no way to follow said

225    chain of custody to insure, by verified testimony, that no alterations to the original provisions in

226    the contract have been made. Therefore, the alleged copy of the original is only hearsay

227    evidence that an original document at one time existed. Petitioner maintains that, absent

228    production of admissible evidence of a contractual obligation on the part of Petitioner,

229    Defendants are without standing to invoke the subject matter jurisdiction of the court.

### No Proper Evidence of Agency

230

231    Defendants claim agency to represent the principal in a contractual agreement involving

232    Petitioner, however, Defendants have failed to provide any evidence of said agency other than a

233    pronouncement that agency has been assigned by some person, the true identity and capacity of

234 whom has not been established. Defendants can hardly claim to be agents of a principal then
235 refuse to identify said principal. All claims of agency are made from the mouth of the agent with
236 no attempt to provide admissible evidence from the principal.

237 Absent proof of agency. Defendants lack standing to invoke the subject matter jurisdiction of the
238 court.

239     **Special Purpose Vehicle**

240 Since the entity now claiming agency to represent the holder of the security instrument is not the
241 original lender. Petitioner has reason to believe that the promissory note. upon consummation of
242 the contract. was converted to a security and sold into a special purpose vehicle and now resides
243 in a Real Estate Mortgage Investment Conduit (REMIC)   as defined by the Internal Revenue
244 Code and as such. cannot be removed from the REMIC as such would be a prohibited
245 transaction.     If the mortgage was part of a special purpose vehicle and was removed on
246 consideration of foreclosure. the real party in interest would necessarily be the trustee of the
247 special purpose vehicle. Nothing in the pleadings of Defendants indicates the existence of a
248 special purpose vehicle. and the lack of a proper chain of custody documentation gives Petitioner
249 cause to believe defendant is not the proper agent of the real party in interest.

250     *CRIMINAL CONSPIRACY AND THEFT*

251 Defendants. by and through Defendant's Agents. conspired with other Defendants. et al. toward
252 a criminal conspiracy to defraud Petitioner.  Said conspiracy but are not limited to acts of
253 negligence. breach of fiduciary duty. common law fraud. fraud by non-disclosure. and tortuous
254 acts of conspiracy and theft. to include but not limited to. the assessment of improper fees to
255 Petitioner by Lender. which were then used to fund the improper payment of commission fees to
256 Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

257     *AGENT PRACTICED UP-SELLING*

258 By and through the above alleged conspiracy. Agent practiced up-selling to Petitioner.  In so
259 doing. Agent violated the trust relationship actively cultivated by Agent and supported by fact
260 that Agent was licensed by the state. Agent further defrauded Petitioner by failing to disclose
261 Agent's conspiratorial relationship to Lender.   Agent violated Agent's fiduciary duty to
262 Petitioner and the duty to provide fair and honest services. through a series of carefully crafted

263  connivances, wherein Agent proactively made knowingly false and misleading statements of
264  alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead
265  Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of
266  a loan product offered by the Lender.  Said loan product was more expensive than Petitioner
267  could legally afford. Agent acted with full knowledge that Petitioner would have made a
268  different decision had Agent given complete disclosure.

269  ***FRAUDULENT INDUCEMENT***

270  Lender maliciously induced Petitioner to accept a loan product. Lender knew, or should have
271  known, Petitioner could not afford in order to unjustly enrich Lender.

272  ***EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT***

273  Said more expensive loan product was calculated to produce a higher return when sold as a
274  security to an investor who was already waiting to purchase the loan as soon as it could be
275  consummated.

276  **Extra Commission for Late Payments**

277  Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement
278  that Lender intended Petitioner would have difficulty paying. The industry standard payment to
279  the servicer for servicing a mortgage note is 3% of the amount collected. However, if the
280  borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer.
281  Thereby, the Lender stands to receive more than double the regular commission on collections if
282  the borrower pays late.

283  **Extra Income for Handling Foreclosure**

284  Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
285  on which Lender intended petitioner to default. In case of default, the Lender, acting as servicer,
286  receives considerable funds for handling and executing the foreclosure process.

287  **Credit Default Swap Gambling**

288  Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
289  default swap, commonly referred to as a derivative as addressed more fully below.  Since Lender
290  designed the loan to fail, betting on said failure is essentially a sure thing.

291    ### *LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN*

292    Lender sold the security instrument after closing and received consideration in an amount in
293    excess of the lien held by Lender. Since Lender retained the lien document upon the sale of the
294    security instrument, Lender separated the lien from said security instrument, creating a fatal and
295    irreparable flaw.

296    When Lender received consideration while still holding the lien and said consideration was in
297    excess of the amount of the lien. Lender was in a position such that he could not be harmed and
298    could not gain standing to enforce the lien. The lien was, thereby, rendered void.

299    Since the separation of the lien from the security instrument creates such a considerable concern,
300    said separation certainly begs a question: "Why would the Lender retain the lien when selling the
301    security instrument?"

302    When you follow the money the answer is clear. The Lender will hold the lien for three years,
303    then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct
304    the full amount from Lender's tax liability, thereby, receiving consideration a second time.

305    Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
306    lien to the holder of the security, however, the lien once satisfied, does not gain authority just
307    because the holder, after receiving consideration, decides to transfer it to someone else.

308    ### *LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES*

309    Lender further stood to profit by credit default swaps in the derivatives market, by way of inside
310    information that Lender had as a result of creating the faulty loans sure to default. Lender was
311    then free to invest on the bet that said loan would default and stood to receive unjust enrichment
312    a third time. This credit default swap derivative market scheme is almost totally responsible for
313    the stock market disaster we now experience as it was responsible for the stock market crash in
314    1907.

315    ### *LENDER CHARGED FALSE FEES*

316    Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real
317    Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party
318    vendor.

319  Lender charged other fees that were a normal part of doing business and should have been
320  included in the finance charge.

321  Below is a listing of the fees charged at settlement.  Neither at settlement, nor at any other time
322  did Lender or Trustee provide documentation to show that the fees herein listed were valid,
323  necessary, reasonable, and proper to charge Petitioner.

| | | |
|---|---|---:|
| 803 | Appraisal | $196.00 |
| 807 | Mortgage Broker Fee | $4,414.50 |
| 808 | Mortgage Insurance Application Fee | $6.50 |
| 809 | Mortgage Broker Fee | $510.00 |
| 810 | Underwriting Fee | $285.00 |
| 811 | Broker Processing Fee | $500.00 |
| 903 | Hazard Insurance Premium | $91.00 |
| 1101 | Settlement or closing fee | $150.00 |
| 1103 | Title Examination Fee | $175.00 |
| 1104 | Title Insurance Binder | $350.00 |
| 1106 | Notary Fee | $175.00 |
| 1108 | Title Insurance Fee | $350.00 |
| 1201 | Recording Fee | $125.00 |

324  Debtor is unable to determine whether or not the above fees are valid in accordance with the
325  restrictions provided by the various consumer protection laws.  Therefore, please provide: a
326  complete billing from each vendor who provided the above listed services; the complete contact
327  information for each vendor who provided a billed service; clearly stipulate as to the specific
328  service performed; a showing that said service was necessary; a showing that the cost of said
329  service is reasonable; a showing of why said service is not a regular cost of doing business that
330  should rightly be included in the finance charge.

331  The above charges are hereby disputed and deemed unreasonable until such time as said charges
332  have been demonstrated to be reasonable, necessary, and in accordance with the limitations and
333  restrictions included in any and all laws, rules, and regulations intended to protect the consumer.

334  In the event lender fails to properly document the above charges, borrower will consider same as
335  false charges.  The effect of the above amounts that borrower would pay over the life of the note
336  will be an overpayment of $135,904.39  This amount will be reduced by the amount of items
337  above when said items are fully documented.

338  ***RESPA PENALTY***

339  From a cursory examination of the records, with the few available, the apparent RESPA
340  violations are as follows: Good Faith Estimate not within limits, No HUD-1 Booklet, Truth In
341  Lending Statement not within limits compared to Note, Truth in Lending Statement not timely

342      presented. HUD-1 not presented at least one day before closing. No Holder Rule Notice in Note.

343      No 1st Payment Letter.

344      The closing documents included no signed and dated : Financial Privacy Act Disclosure: Equal

345      Credit Reporting Act Disclosure: notice of right to receive appraisal report: servicing disclosure

346      statement: borrower's Certification of Authorization: notice of credit score: RESPA servicing

347      disclosure letter: loan discount fee disclosure: business insurance company arrangement

348      disclosure: notice of right to rescind.

349      The courts have held that the borrower does not have to show harm to claim a violation of the

350      Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance. And,

351      in as much as the courts are directed to assess a penalty of no less than two hundred dollars and

352      no more than two thousand, considering the large number enumerated here, it is reasonable to

353      consider that the court will assess the maximum amount for each violation.

354      Since the courts have held that the penalty for a violation of RESPA accrues at consummation of

355      the note. borrower has calculated that, the number of violations found in a cursory examination

356      of the note. if deducted from the principal. would result in an overpayment on the part of the

357      borrower. over the life of the note. of $229,631.39.

358      If the violation penalty amounts for each of the unsupported fees listed above are included. the

359      amount by which the borrower would be defrauded is $264,046.29

360      Adding in RESPA penalties for all the unsupported settlement fees along with the TILA/Note

361      variance. it appears that lender intended to defraud borrower in the amount of $629,969.38

362      **_LENDER CONSPIRED WITH APPRAISER_**

363      Lender. in furtherance of the above referenced conspiracy. conspired with appraiser for the

364      purpose of preparing an appraisal with a falsely stated price. in violation of appraiser's fiduciary

365      duty to Petitioner and appraiser's duty to provide fair and honest services. for the purpose of

366      inducing Petitioner to enter into a loan product that was fraudulent toward the interests of

367      Petitioner.

368      **_LENDER CONSPIRED WITH TRUSTEE_**

369      Lender conspired with the trust Agent at closing to create a condition of stress for the specific

370      purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and

371      fully understand what was being signed.

372   The above referenced closing procedure was a carefully crafted connivance, designed and
373   intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
374   to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner
375   did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
376   as required by various consumer protection statutes.

377   ### *DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES*

378   In the manner in which Defendants have carried on their business enterprises, they have engaged
379   in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.
380   (Deceptive Practices Act).

381   Such conduct comprises a pattern of business activity within the meaning of such statutes, and
382   has directly and proximately caused Petitioner to suffer economic and non-economic harm and
383   detriment in an amount to be shown according to proof at trial of this matter.

384   ### *EQUITABLE TOLLING FOR TILA AND RESPA*

385   The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be
386   Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

387   Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*
388   *1601,* et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)
389   are subject to a one-year limitations period; however, such claims are subject to the equitable
390   tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as
391   subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held
392   that given the remedial purpose of TILA, the limitations period should run from the date of
393   consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate
394   circumstances, suspend the limitations period until the borrower discovers or has reasonable
395   opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*
396   *v. California, 784 F.2d 910, 915 9*th Cir. 1986).

397   Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614,* the
398   anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold
399   that such limitations period may be equitably tolled. The Court of Appeals for the District of
400   Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*

401 *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986),* while the Seventh Circuit came to the
402 opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*
403 *Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding
404 that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*
405 *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*
406 *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has
407 interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the
408 language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not
409 of precedential value, this Court has previously found both the TILA and **RESPA** limitations
410 periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*
411 *F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

412 The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay
413 by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the
414 existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*
415 *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*
416 Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on
417 any wrongful conduct by the Defendants. Santa Maria. at 1178.

418 ***BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING***
419 ***STANDARDS***

420 Traditionally, Lenders required borrowers seeking mortgage loans to document their income and
421 assets by, for example, providing W-2 statements, tax returns, bank statements, documents
422 evidencing title, employment information, and other information and documentation that could
423 be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's
424 ability to repay a particular loan over both the short and long term. Defendants deviated from and
425 disregarded these standards, particularly with regard to its riskier and more profitable loan
426 products.

427 **Low-Documentation/No-Documentation Loans.**

428 Driven by its desire for market share and a perceived need to maintain competitiveness with the
429 likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no
430 documentation loan products, including the HARMs and HELOCs described hereinabove, and
431 began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to

432   the already eased underwriting standards to the point of disregarding such standards. This
433   quickened the loan origination process, allowing for the generation of more and more loans
434   which could then be resold and/or securitized in the secondary market.

435   Defendants marketed no-documentation/low-documentation loan programs that included
436   HARMs and HELOCs, among others, in which loans were given based on the borrower's "stated
437   income" or "stated assets" (SISA) neither of which were verified. Employment was verbally
438   confirmed, if at all, but not further investigated, and income, if it was even considered as a factor,
439   was to be roughly consistent with incomes in the types of jobs in which the borrower was
440   employed. When borrowers were requested to document their income, they were able to do so
441   through information that was less reliable than in a full-documentation loan.

442   For stated income loans, it became standard practice for loan processors, loan officers and
443   underwriters to rely on www.salary.com to see if a stated income was reasonable.  Such stated
444   income loans, emphasizing loan origination from a profitability standpoint at the expense of
445   determining the ability of the borrower to repay the loan from an underwriting standpoint,
446   encouraged the overstating and/or fabrication of income.

447        **Easing of Underwriting Standards**

448   In order to produce more loans that could be resold in the secondary mortgage market,
449   Defendants also relaxed, and often disregarded, traditional underwriting standards used to
450   separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing
451   the base FICO score needed for a SISA loan.

452   Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
453   used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
454   loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
455   income ratios (the amount of monthly income compared to monthly debt service payments and
456   other monthly payment obligations.

457   With respect to HARMS, Defendants underwrote loans without regard to the borrower's long-
458   term financial circumstances, approving the loan based on the initial fixed rate without taking
459   into account whether the borrower could afford the substantially higher payment that would
460   inevitably be required during the remaining term of the loan.

461  With respect to HELOCs, Defendants underwrote and approved such loans based only on the
462  borrower's ability to afford the interest-only payment during the initial draw period of the loan,
463  rather than on the borrower's ability to afford the subsequent, fully amortized principal and
464  interest payments.

465  As Defendants pushed to expand market share, they eased other basic underwriting standards.
466  For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
467  allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. <u>At the same time that they</u>
468  <u>eased underwriting standards the Defendants also were encouraging consumers to go further into</u>
469  <u>debt in order to supply the very lucrative aftermarket of mortgage backed securities. The relaxed</u>
470  <u>underwriting standards created the aftermarket supply they needed. As a result, the Defendants</u>
471  <u>made it easy for the unwary consumer to take on more debt than he could afford by encouraging</u>
472  <u>unsound financial practices, all the while knowing defaults would occur more and more</u>
473  <u>frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting</u>
474  <u>standards.</u>

475  Defendants knew, or in the exercise of reasonable care should have known, from its own
476  underwriting guidelines industry standards that it was accumulating and selling/reselling risky
477  loans that were likely to end up in default. However, as the pressure mounted to increase market
478  share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
479  underwriting guidelines. Such was the environment that loan officers and underwriters were,
480  from time to time, placed in the position of having to justify why they did not approve a loan that
481  failed to meet underwriting criteria.

482  **Risk Layering**

483  Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
484  loans with one or more relaxed underwriting standards.

485  Defendants knew, or in the exercise of reasonable care should have known, that layered risk
486  would increase the likelihood of default. Among the risk layering Defendants engaged in were
487  approving HARM loans with little to no down payment, little to no documentation, and high
488  DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
489  the loans it promoted to borrowers.

490 Loan officers and mortgage Agents aided and abetted this scheme by working closely with other
491 mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to
492 believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did
493 business ignored basic established underwriting standards and acted to mislead the borrower, all
494 to the detriment of the borrower and the consumer of loan products..

495 Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,
496 engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the
497 business practices described above in paragraphs 30-42 of this Complaint

498 *UNJUST ENRICHMENT*

499 Petitioner is informed and believes that each and all of the Defendants received a benefit at
500 Petitioner's expense, including but not limited to the following: To the Agent, commissions,
501 yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to
502 be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,
503 surcharges and other "back end" payments in amounts to be proved at trial; To the investors,
504 resale premiums, and high rates of return; To the servicers including EMS, servicing fees,
505 percentages of payment proceeds, charges, and other "back end" payments in amounts to be
506 proved at trial; To all participants, the expectation of future revenues from charges, penalties and
507 fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

508 By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,
509 and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly
510 deprived, and is entitled to restitution in the amount of $629,969.38

511 *CLAIM TO QUIET TITLE.*

512 Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and
513 the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title
514 interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission
515 and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

516 Defendants have no title, estate, lien, or interest in the Subject Property in that the purported
517 power of sale contained in the Deed of Trust is of no force or effect because Defendants' security
518 interest in the Subject Property has been rendered void and that the Defendants are not the holder

ORIGINAL PETITION                                                                18 of 24

519   in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'
520   involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

521          "a Petitioner is entitled to damages from those Defendants who concur in the tortuous
522          scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*
523          *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*
524          *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*
525          *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*
526          *Rptr. 2d 752 (2d Dist. 1995).*

527   ### SUFFICIENCY OF PLEADING

528   Petitioner has sufficiently pled that relief can be granted on each and every one of the
529   Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond
530   doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would
531   entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All
532   allegations of material fact in the complaint are taken as true and construed in the light most
533   favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

534   Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.
535   8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal
536   theories, and seeks remedies to which Petitioner is entitled. *Balistreri v. Pacifica Police Dept., 901 F.2d*
537   *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal
538   conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court
539   should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,
540   Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of
541   their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,
542   relief as requested herein should be granted.

543   ## CAUSES OF ACTION

544   ### BREACH OF FIDUCIARY DUTY

545   Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary
546   duty of care with respect to the mortgage loan transactions and related title activities involving
547   the Trust Property.

548 Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
549 breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
550 all applicable laws governing the loan transactions in which they were involved, including but
551 not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

552 Defendant's breaches of said duties were a direct and proximate cause of economic and non-
553 economic harm and detriment to Petitioner(s).

554 Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,
555 all to be shown according to proof at trial of this matter.

556     *CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE*

557 Defendants owed a general duty of care with respect to Petitioners, particularly concerning their
558 duty to properly perform due diligence as to the loans and related transactional issues described
559 hereinabove.

560 In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations
561 X and Z promulgated there under to, among other things, provide proper disclosures concerning
562 the terms and conditions of the loans they marketed, to refrain from marketing loans they knew
563 or should have known that borrowers could not afford or maintain, and to avoid paying undue
564 compensation such as "yield spread premiums" to mortgage Agents and loan officers.

565 Defendants knew or in the exercise of reasonable care should have known, that the loan
566 transactions involving Petitioner and other persons similarly situated were defective, unlawful,
567 violative of federal and state laws and regulations, and would subject Petitioner to economic and
568 non-economic harm and other detriment.

569 Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
570 Z promulgated there under were intended and designed to protect, and the conduct alleged
571 against Defendants is the type of conduct and harm which the referenced statutes and regulations
572 were designed to deter.

573 As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
574 non-economic harm in an amount to be shown according to proof at trial.

ORIGINAL PETITION             20 of 24

575    **AGENT: COMMON LAW FRAUD**

576    If any Agents' misrepresentations made herein were not intentional, said misrepresentations were
577    negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable
578    ground for believing them to be true.

579    Agents made these representations with the intention of inducing Petitioner to act in reliance on
580    these representations in the manner hereafter alleged, or with the expectation that Petitioner
581    would so act.

582    Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents
583    in their negligent misrepresentation, and that various Agents were negligent in not implementing
584    procedures such as underwriting standards oversight that would have prevented various Agents
585    from facilitating the irresponsible and wrongful misrepresentations of various Agents to
586    Defendants.

587    Petitioner is informed and believes that Agent acted in concert and collusion with others named
588    herein in promulgating false representations to cause Petitioner to enter into the LOAN without
589    knowledge or understanding of the terms thereof.

590    As a proximate result of the negligent misrepresentations of Agents as herein alleged, the
591    Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of
592    opportunities, attorney fees and costs, and other damages to be determined at trial. As a
593    proximate result of Agents' breach of duty and all other actions as alleged herein, Defendants has
594    suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and
595    mental and physical pain and anguish, all to Petitioner's damage in an amount to be established
596    at trial.

597    ***PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED***
598    ***COVENANT OF GOOD FAITH AND FAIR DEALING.***

599    Petitioner properly pled Defendants violated the breach of implied covenant of good faith and
600    fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its
601    performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*
602    *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*

ORIGINAL PETITION                                                    21 of 24

603 *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
604 *Jones, (2004) 33 Cal. 4th 917,* the court stated:

605    In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
606    particular significance, in part because of the special relationship between the insurer and the
607    insured. The insurer, when determining whether to settle a claim, must give at least as much
608    consideration to the welfare of its insured as it gives to its own interests. . . The standard is
609    premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

610    Likewise, there is a special relationship between an Agent and borrower. "A person who
611    provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or
612    otherwise negotiating a consumer loan secured by real property, is the fiduciary of the
613    consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may
614    be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in
615    *good faith.* If the *Agent knew or should have known that the Borrower will or has a likelihood of*
616    *defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan."
617    (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov).
618    [*Emphasis Added*].

619    All Defendants, willfully breached their implied covenant of good faith and fair dealing with
620    Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to
621    provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
622    product without regard for other more affordable products; (4) Placed Petitioner into a loan
623    without following proper underwriting standards; (5) Failed to disclose to Petitioner that
624    Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
625    valid and /or properly documented substitutions and assignments so that Petitioner could
626    ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
627    request for documentation of the servicing of Petitioner's loan and the existence and content of
628    relevant documents. Additionally, Defendants breached their implied covenant of good faith and
629    fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
630    right under an alleged power of sale because the purported assignment was not recorded and by
631    willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
632    special relationship inherent in a real estate transaction between Agent and borrower, *and* all
633    Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

634  *CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET*
635  *SEQ*

636  Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation
637  contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of
638  Action as though the same were set forth herein.

639  Petitioner is informed and believes that Defendant's violation of the provisions of law rendered
640  the credit transaction null and void, invalidates Defendant's claimed interest in the Subject
641  Property, and entitles Petitioner to damages as proven at trial.

642  *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

643  The conduct committed by Defendants, driven as it was by profit at the expense of increasingly
644  highly leveraged and vulnerable consumers who placed their faith and trust in the superior
645  knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by
646  civilized society.

647  Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
648  distress, or acted in conscious and/or reckless disregard of the probability that such distress
649  would occur.

650  Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
651  conduct of Defendants as described hereinabove.

652  As a result of such severe emotional distress, Petitioner suffered economic and non economic
653  harm and detriment, all to be shown according to proof at trial of this matter.

654  Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
655  Petitioner and secure to Petitioner quite title;

656  Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
657  as payments to Defendants based on the fraudulently secured promissory note in an amount to be
658  calculated by Defendants and verified to Petitioner;

659  Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the
660  amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
661  equal to $1,889,908.14

ORIGINAL PETITION                                                         23 of 24

662 **PRAYER**

663 WHEREFORE, Petitioner prays for judgment against the named Defendants, and each of them,

664 as follows:

665        For an emergency restraining order enjoining lender and any successor in interest from

666        foreclosing on Petitioner's Property pending adjudication of Petitioner's claims set forth

667        herein;

668        For a permanent injunction enjoining Defendants from engaging in the fraudulent,

669        deceptive, predatory and negligent acts and practices alleged herein;

670        For quiet title to Property;

671        For rescission of the loan contract and restitution by Defendants to Petitioner according

672        to proof at trial;

673        For disgorgement of all amounts wrongfully acquired by Defendants according to proof

674        at trial;

675        For actual monetary damages in the amount $629,969.38;

676        For pain and suffering due to extreme mental anguish in an amount to be determined at

677        trial.

678        For pre-judgment and post-judgment interest according to proof at trial;

679        For punitive damages according to proof at trial in an amount equal to $1,889,908.14.

680        For attorney's fees and costs as provided by statute; and,

681        For such other relief as the Court deems just and proper.

682 **Respectfully Submitted,**

683

684 _John W Ferguson_     _Cynthia L Ferguson_

685   John W Ferguson     Cynthia L Ferguson

ORIGINAL PETITION